United States Bankruptcy Court
Southern District of Texas
**ENTERED**
January 27, 2023
Nathan Ochsner, Clerk

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 15-34287 |
| BLACK ELK ENERGY OFFSHORE | § | |
| OPERATIONS, LLC, *et al.*, | § | CHAPTER 11 |
| | § | |
| Debtors. | § | |
| | § | |
| RICHARD SCHMIDT, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | ADVERSARY NO. 19-3370 |
| | § | |
| BARBARA NORDLICHT, AS LEGAL | § | |
| REPRESENTATIVE OF THE ESTATE OF | § | |
| JULES NORDLICHT, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION

Richard Schmidt, the Trustee of the Black Elk Litigation Trust, moved for partial summary judgment. This opinion concerns the portion of the Trustee's motion seeking a determination that the knowledge of Mark Nordlicht, a principal of Platinum Partners and subagent of investors in Platinum Partners Black Elk Opportunities Fund LLC ("PPBEO"), is imputed to the PPBEO investor defendants. Because Nordlicht's knowledge is imputed to the defendants, the investors are precluded from asserting a good faith defense. The defendants[1] will not retain the benefits of their agent's wrongful conduct. The Court grants partial summary judgment.

---

[1] The defendants include, among others, Nordlicht's mother, Nordlicht's father's estate, his parent's charitable institution bearing the Nordlicht name, his sister, and his brother-in-law. Although these are close relationships, it is not their relationships that create the duty to return the fraudulently obtained funds. These defendants understandably appointed Nordlicht as their agent for the investment of these funds. It is that agency relationship that creates the imputation of knowledge to the defendants and removes the availability of a "good faith" defense. The closeness of the relationships of other defendants is a disputed factual issue.

## BACKGROUND

The parties agree that certain defendants[2] invested in PPBEO. To invest, the defendants signed (i) Subscription Agreements; and (ii) the LLC Agreement. (ECF Nos. 181 at 76; 219 at 25). Paragraph 18 of each Subscription Agreement states:

> **Power of Attorney.** In connection with the Interests of Subscriber in the Company to be acquired pursuant to this Agreement, *Subscriber hereby irrevocably constitutes and appoints the Managing Member the true and lawful attorney-in-fact of Subscriber in Subscriber's name, place and stead to make, execute, acknowledge, deliver and file any of the following documents*: (i) the LLC Agreement and all documents permitted to be executed thereunder; and (ii) to the extent consistent with the provisions of the LLC Agreement (a) all amendments and/or restatements of the LLC Agreement adopted in accordance with the provisions thereof, (b) all documents that may be required to effect the dissolution and termination of the Company pursuant to the LLC Agreement and the cancellation of the Certificate of Formation, and (c) *otherwise to take any such further action as may be necessary in connection with any aspect of the operations of the Company by giving the Managing Member full power and authority to do and perform each and every act and thing whatever requisite and necessary to be done in and about the foregoing as fully as the undersigned might or could do if personally present, and by hereby ratifying and confirming all that the Managing Member shall lawfully do or cause to be done by virtue thereof.* This foregoing power of attorney is coupled with an interest, is irrevocable and shall survive and be unaffected by any subsequent disability, or incapacity of Subscriber (or if Subscriber is a corporation, partnership, trust, association, limited liability company or other legal entity, by the dissolution or termination thereof).

(ECF No. 181-17 at 5–6) (emphasis added). The Subscription Agreement defines "Managing Member" as PPBE Holdings LLC. (ECF No. 181-17 at 3). Paragraph 12.1 of the LLC Agreement states:

> 12.1.1 Each Member, by its execution hereof hereby makes, constitutes and appoints the Managing Member as its true and lawful agent and attorney-in-fact, with full power of substitution and full power and authority in its name, place and stead, to make, execute, sign, acknowledge, swear to, record and file (i) this

---

[2] Barbara Nordlicht as representative of the Estate of Jules Nordlicht, Barbara Nordlicht as Trustee of the Jules and Barbara Nordlicht Foundation, Inc., Shlomo Rechnitz, Tamar Rechnitz, Morris Fuchs, The Shmuel Fuchs Foundation, Inc., Ora Gichtin, David Gichtin, FCBA Trust, Sol Werdiger, Aaron Parnes, MN Consulting NY LLC, Great Legacy of New York Corp. Pension Plan, Abraham Grossman, Platinum FI Group LLC, Sheldon Perl, Perl Equity Holdings, LLC, Meadows Capital, LLC, Ditmas Park Capital, L.P., and Rockwell Fulton Capital, L.P. (ECF No. 181 at 11).

>Agreement and any amendment to this Agreement, (ii) the original Certificate of Formation and all amendments thereto required or permitted by law or the provisions of this Agreement, (iii) all certificates and other instruments deemed advisable by the Managing Member to carry out the provisions of this Agreement and applicable law or to permit the Company to become or to continue as a limited liability company wherein the Members have limited liability in a jurisdiction where the Company may be doing business, (iv) all instruments that the Managing Member deems appropriate to reflect a change or modification of this Agreement or the Company in accordance with this Agreement, including without limitation the substitution of assignees as Members pursuant to Section 9.2 and amendments to this Agreement, (v) all conveyances and other instruments or papers deemed advisable by the Managing Member to effect the dissolution and termination of the Company, (vi) all fictitious or assumed name certificates required or permitted to be filed on behalf of the Company, and (vii) all other instruments or papers which may be required or permitted by law to be filed on behalf of the Company.
>
>12.1.2 ***Each Member by its respective execution hereof hereby authorizes and appoints the Managing Member as its true and lawful agent and attorney-in-fact, with full power of substitution and full power and discretionary authority to act in the Company's name, place and stead, to make the Company's investments and execute any trades ancillary to such investments.***

(ECF No. 183-10 at 27–28) (emphasis added). The LLC Agreement also defines "Managing Member" as PPBE Holdings LLC. (ECF No. 183-10 at 7).

The defendants do not dispute the Trustee's allegations concerning the fraudulent transfers after the sale of substantially all of Black Elk Energy Offshore Operations, LLC's assets (the "Renaissance Sale"). Platinum Partners invested in Black Elk in 2009. (ECF No. 85 at 6). In 2013, Nordlicht and other Platinum principals created various Black Elk investment funds, including PPBEO. (ECF No. 85 at 7). The defendants invested in Black Elk Series E preferred equity through PPBEO. (ECF No. 85 at 7). By 2014, Platinum dominated and controlled Black Elk: Platinum was Black Elk's majority investor, and Platinum controlled Black Elk's (i) credit facility, (ii) senior secured notes, (iii) Series E preferred equity; (iv) board; and (v) chief financial officer. (ECF No. 85 at 7). Both Black Elk and Platinum were effectively insolvent in 2014. (ECF No. 85 at 7).

At Nordlicht's[3] direction, Platinum schemed to use approximately $125,000,000.00 of the Renaissance Sale proceeds to redeem preferred equity instead of paying Black Elk's senior secured notes debt or substantially overdue trade creditors. (ECF No. 85 at 7–8, 48). By paying off preferred equity and retaining the notes, Platinum would also benefit through a priority position in Black Elk's anticipated bankruptcy. (ECF No. 85 at 8). Nordlicht was later convicted of securities fraud, conspiracy to commit securities fraud, and conspiracy to commit wire fraud for his role in the scheme to defraud Black Elk's bondholders. *See United States v. Landesman*, 17 F.4th 298, 303 (2d Cir. 2021), *cert. denied sub nom. Nordlicht v. United States*, 143 S. Ct. 86 (2022). The Court has already granted summary judgment that Black Elk transferred approximately $77,000,000.00 in an actual fraudulent transfer following the Renaissance Sale. (ECF No. 292 at 1). There is no denial that Nordlicht was intimately involved with Platinum and Black Elk's affairs and knew of Platinum's fraudulent designs with the Renaissance Sale. (ECF No. 181 at 78).

At the time of the Renaissance Sale and subsequent fraudulent transfers, Nordlicht was (i) the principal of PPBE Holdings LLC (PPBEO's Managing Member); and (ii) the managing member of PPBE Management LLC. (ECF Nos. 181 at 77; 208-2 at 15). Under PPBEO's Private Placement Memorandum, PPBE Holdings LLC delegated PPBEO's "investment management and certain other related responsibilities" to PPBE Management LLC. (ECF No. 208-2 at 15). Specifically, PPBE Management LLC assumed responsibility "for the purchase of the Notes, including all rights that arise pursuant thereto." (ECF No. 208-2 at 15). "Notes" are defined as "publicly traded secured notes and/or 144A secured notes newly issued by Black Elk Energy Offshore Operations, LLC or previously issued by Black Elk Energy Offshore Operations, LLC and currently held by PPVA Black Elk (Equity) LLC or other third party holders . . . ." (ECF No.

---

[3] Nordlicht was not acting alone, but his participation is what is relevant to this decision.

208-2 at 7). In signing the Subscription Agreements, the defendants attested that they understood and agreed to abide by the terms in the Private Placement Memorandum. (ECF No. 181-17 at 3).

The defendants filed opposition briefs to the Trustee's motion. (ECF Nos. 211; 212). The Court heard oral argument on July 27, 2022 but delayed issuing a ruling pending a mediation between certain parties. (ECF No. 252). Mediation failed.

## JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. § 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(H). Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact means that evidence is such that a reasonable fact finder "could return a verdict for the nonmoving party." *Gorman v. Verizon Wireless Tex., L.L.C.*, 753 F.3d 165, 170 (5th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). It is the movant's burden to establish that no genuine issue of material fact exists. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (citing *Condrey v. SunTrust Bank of Ga.,* 429 F.3d 556, 562 (5th Cir. 2005)). A party asserting that a fact cannot be or is not genuinely disputed must support that assertion by citing to particular parts of materials in the record, showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support that fact. FED. R. CIV. P. 56(c)(1). If the movant establishes "the absence of evidence supporting an essential element of the non-movant's case," the burden shifts to the non-movant to establish a genuine dispute of material fact. *Sossamon*, 560 F.3d at 326 (citing *Condrey*, 429 F.3d at 562).

In ruling on a motion for summary judgment, a court should view the facts and evidence in light most favorable to the non-moving party. *Plumhoff v. Rickard*, 572 U.S. 765, 768 (2014). Nevertheless, the court is not obligated to search the record for the non-moving party's evidence. *Keen v. Miller Env't. Grp., Inc.*, 702 F.3d 239, 249 (5th Cir. 2012). "Summary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015). The Court need only consider the cited materials, but it may consider other materials in the record. FED. R. CIV. P. 56(c)(3). The Court should not weigh the evidence. *Aubrey v. Sch. Bd. of Lafayette Par.*, 92 F.3d 316, 318 (5th Cir. 1996). A credibility determination may not be part of the summary judgment analysis. *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014).

## DISCUSSION

The Trustee seeks a finding that the defendants are not entitled to a good faith defense: "Because Nordlicht's knowledge is to be imputed, the PPBEO Defendants are not entitled to the good faith defense under either the Texas Business & Commerce Code Section 24.009(a) or Sections 548 or 550." (ECF No. 181 at 78). Because Nordlicht was the defendants' subagent and was acting within the scope of his authority, his knowledge is imputed to them. The defendants' good faith defense fails.

**I.    GOOD FAITH DEFENSE**

Under Section 24.009(a) of the Texas Business and Commerce Code, "[a] transfer or obligation is not voidable under Section 24.005(a)(1) of this code against a person who took ***in good faith*** and for a reasonably equivalent value or against any subsequent transferee or obligee." TEX. BUS. & COMMERCE CODE § 24.009(a) ("TUFTA") (emphasis added). Section 548(c) of the Bankruptcy Code states:

> [A] transferee or obligee of such a transfer or obligation that takes for value ***and in good faith*** has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

11 U.S.C. § 548(c) (emphasis added). Section 550 of the Bankruptcy Code permits the Trustee to recover the property or value of property transferred and avoided under various sections of the Bankruptcy Code, including § 548.[4] Under § 550, the Trustee may recover from "the initial transferee of such transfer or the entity for whose benefit such transfer was made" or "any immediate or mediate transferee of such initial transferee." Immediate or mediate transferees may defend against a § 550 action by showing they took "for value, . . . ***in good faith***, and without knowledge of the voidability of the transfer avoided . . . ." 11 U.S.C. § 550(b)(1) (emphasis added).

As cases discussing this topic frequently note, the Bankruptcy Code does not define "good faith." *See, e.g.*, *Christian Brothers High School Endowment v. Bayou No Leverage Fund (In re Bayou Group, LLC)*, 439 B.R. 284, 310–12 (S.D.N.Y. 2010)) ("[C]ourts have struggled in applying this term, and the case law discussing Section 548(c)'s good faith affirmative defense is marked by a lack of clarity if not outright confusion."). Unsurprisingly, the equities of particular cases sometimes influence opinions examining good faith. *In re Telesphere Commc'ns, Inc.*, 179 B.R. 544, 557 (Bankr. N.D. Ill. 1994).

Courts have applied an objective standard to good faith defenses under state fraudulent transfer laws. *See GE Cap. Com., Inc. v. Worthington Nat. Bank*, 754 F.3d 297, 313 (5th Cir. 2014) (making an *Erie* guess that the Supreme Court of Texas would apply the objective good faith standard under TUFTA); *Warfield v. Byron*, 436 F.3d 551, 559–60 (5th Cir. 2006) (applying objective good faith to Washington's Uniform Fraudulent Transfer Act (citing *Hayes v. Palm*

---

[4] The complaint includes claims for avoidance of the transfers of the Renaissance Sale proceeds under § 548. (ECF No. 85 at 86–88).

*Seedlings Partners (In re Agric. Rsch. and Tech. Grp., Inc.)*, 916 F.2d 528, 535–36 (9th Cir. 1990)); *Smith v. Suarez (In re IFS Fin. Corp.)*, 417 B.R. 419, 442 (Bankr. S.D. Tex. 2009), *aff'd sub nom. IFS Fin. Corp. v. Garcia Suarez*, No. H-09-CV-3059, 2010 WL 11652027 (S.D. Tex. Sept. 11, 2010), *aff'd sub nom. In re IFS Fin. Corp.*, 803 F.3d 195 (5th Cir. 2015) *and subsequently aff'd*, 669 F.3d 255 (5th Cir. 2012) (finding that "[c]ourts apply an objective standard for determining 'good faith'" under TUFTA). The Court is bound by the Fifth Circuit's *Erie* determination and does not depart from precedent applying the objective standard to good faith under TUFTA Section 24.009(a).

Under the objective standard, transferees must show that that "their knowledge of particular facts was not such that they 'should have known' of the fraudulent scheme" in order to prove good faith. *IFS Fin. Corp.*, 417 B.R. at 442 (citing *Warfield,* 436 F.3d at 559–60); *see Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1355 (8th Cir. 1995) ("To determine whether a transferee acts in good faith [under § 548(c)], courts look to what the transferee objectively 'knew or should have known' instead of examining the transferee's actual knowledge from a subjective standpoint." (quoting *Agric. Rsch.*, 916 F.2d at 535–36)) (cleaned up); *id.* at 1357 ("If a transferee possesses knowledge of facts that suggest a transfer may be fraudulent, and further inquiry by the transferee would reveal facts sufficient to alert him that the property is recoverable, he cannot sit on his heels, thereby preventing a finding that he has knowledge. In such a situation, the transferee is held to have knowledge of the voidability of the transfer."); *Jobin v. McKay (In re M & L Bus. Mach. Co.)*, 84 F.3d 1330, 1338 (10th Cir. 1996) ("[W]e conclude that the bankruptcy court and the district court properly held that good faith under § 548(c) should be measured objectively and that 'if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a *diligent* inquiry would have discovered the fraudulent purpose, then the transfer is

fraudulent.'" (quoting *Jobin v. McKay (In re M & L Bus. Mach. Co., Inc.)*, 164 B.R. 657, 661 (D. Colo. 1994))) (partially overruled on other grounds); 5 COLLIER ON BANKRUPTCY ¶ 550.03 (16th ed. 2022) ("Showing this lack of good faith includes circumstances that would put a reasonable person on inquiry notice of insolvency or fraudulent intent where a diligent investigation would have discovered the fraudulent transfer.").

The Fifth Circuit has held that "inquiry notice" is the appropriate test for determining good faith under § 548(c).[5] *See Templeton v. O'Cheskey (In re Am. Hous. Found.)*, 785 F.3d 143, 164 (5th Cir. 2015), *as revised* (June 8, 2015) ("Although this court has not announced a definitive definition of good faith under Section 548(c) in a published case, . . . we have stated in an unpublished case that we must "'look to whether the claimant was on notice of the debtor's insolvency or the fraudulent nature of the transaction.'" (quoting *Horton v. O'Cheskey (In re Am. Hous. Found.)*, 544 Fed. Appx. 516, 520 (5th Cir. 2013))) (citations omitted). To determine if a party was on inquiry notice, the Fifth Circuit adopted a two-part test:

> The good faith test under Section 548(c) is generally presented as a two-step inquiry. The first question typically posed is whether the transferee had information that put it on inquiry notice that the transferor was insolvent or that the transfer might be made with a fraudulent purpose. While the cases frequently cite either fraud or insolvency, these two elements are consistently identified as the triggers for inquiry notice. The fraud or insolvency predicate is set forth in countless cases. . . .
>
> The weight of the authority . . . indicates that a court should focus on the circumstances specific to the transfer at issue—that is, whether a transferee reasonably should have known . . . of the fraudulent intent underlying the transfer.

---

[5] Good faith under §§ 548 and 550 appears to be the same. *See Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Sec. LLC)*, 12 F.4th 171, 186 (2d Cir. 2021), *cert. denied sub nom. Citibank, N.A. v. Picard*, 142 S. Ct. 1209 (2022) "[Sections 548 and 550] offer 'no reason to depart from the normal rule of statutory construction that words repeated in different parts of the same statute generally have the same meaning.'" (quoting *Law v. Siegel*, 571 U.S. 415, 422 (2014))).

> Once a transferee has been put on inquiry notice of either the transferor's possible insolvency or of the possibly fraudulent purpose of the transfer, the transferee must satisfy a "diligent investigation" requirement.

*Horton*, 544 Fed. Appx. at 520 (quoting *Christian Brothers*, 439 B.R. at 310–12). The first question examines whether a reasonable person in the transferee's position would have been on inquiry notice—an objective standard. *See Sherman*, 67 F.3d at 1355; *Bonded Fin. Services, Inc. v. European Am. Bank*, 838 F.2d 890, 897–98 (7th Cir. 1988) ("Venerable authority has it that the recipient of a voidable transfer may lack good faith if he possessed enough knowledge of the events to induce a reasonable person to investigate." (citing *Dokken v. Page,* 147 F. 438 (8th Cir. 1906))). In applying this standard, courts must begin with the transferee's knowledge. *See Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Sec. LLC)*, 12 F.4th 171 (2d Cir. 2021), *cert. denied sub nom. Citibank, N.A. v. Picard*, 142 S. Ct. 1209 (2022) ("[E]ven courts that use the phrase 'should have known' acknowledge that the first step in the inquiry notice analysis looks to what facts the defendant *knew*." (citing *Sherman*, 67 F.3d at 1355)).[6]

In order to determine whether the defendants were on inquiry notice and thus precluded from a good faith defense, the Court must determine (i) whether Nordlicht was the defendants'

---

[6] The Second Circuit recently held that (i) inquiry notice is inherent in a good faith defense under §§ 548 and 550 and (ii) inquiry notice is *both* an objective and subjective test. *Picard*, 12 F.4th at 188, 191. The good faith defense under § 550(b)(1) should thus "be approached in a three-step inquiry":

> First, a court must examine what facts the defendant knew; this is a subjective inquiry and not "a theory of constructive notice." Second, a court determines whether these facts put the transferee on inquiry notice of the fraudulent purpose behind a transaction—that is, whether the facts the transferee knew would have led a reasonable person in the transferee's position to conduct further inquiry into a debtor-transferor's possible fraud. Third, once the court has determined that a transferee had been put on inquiry notice, the court must inquire whether "diligent inquiry [by the transferee] would have discovered the fraudulent purpose" of the transfer.

*Id.* at 191–92 (citations omitted). The second and third steps involve an objective standard while the first step is subjective. *Id.* at 192 (citing *Christian Brothers*, 439 B.R. at 313). The Fifth Circuit's iteration of the test asks the same essential questions. *Compare Templeton*, 785 F.3d at 164, *with Picard*, 12 F.4th at 191–92 (both ultimately citing *Christian Brothers*).

agent; (ii) whether his knowledge is imputed to the defendants; and (iii) whether that imputed knowledge placed the defendants on inquiry notice.

### A.     Imputation of an Agent's Knowledge

It is a basic tenant of agency law that an agent's knowledge is imputed to its principal.[7] *Compare ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, No. CIV.A. 5843-VCL, 2012 WL 1869416, at *15 (Del. Ch. May 16, 2012), *judgment entered*, (Del. Ch. 2012) *and aff'd*, 68 A.3d 665 (Del. 2013) ("Delaware law states the knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal." (quoting *Albert v. Alex. Brown Mgmt. Servs., Inc.,* 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005))), *and TSA Stores, Inc. v. Sport Dimension Inc. (In re TSAWD Holdings, Inc.)*, 601 B.R. 599, 604 (Bankr. D. Del. 2019) ("Delaware courts will impute an agent's knowledge to its principal when such knowledge is material to the agent's duties, i.e., "'the knowledge has some significance which the [agent] could be reasonably expected to perceive.'" (quoting *Affordable Home Enters. v. Nelson*, No. 91C-08-024, 1994 WL 315227, at *7–9 (Del. Super. May 25, 1994))), *and J. I. Kislak Mortg. Corp. of Del. v. William Matthews Builder, Inc.*, 287 A.2d 686, 689 (Del. Super. Ct. 1972), *aff'd*, 303 A.2d 648 (Del. 1973) ("Notice of an agent acquired while acting within the scope of his authority is imputable to the principal."), *and In re Cyber Litig. Inc.*, No. 20-12702 (CTG), 2021 WL 5047512, at *6 (Bankr. D. Del. Oct. 28, 2021) (discussing the "established principle that notice on an agent is sufficient to bind the principal . . . ."), *with Minter v. Great Am. Ins. Co. of N.Y.*,

---

[7] The Trustee argues that Delaware agency law applies because PPBEO is a Delaware limited liability company, but Texas law leads to the same outcome. (ECF No. 181 at 77). Because Texas and Delaware law appear to be consistent on general principles of agency law, the Court need not determine which law applies. *See, e.g.*, *Schneider Nat. Transp. v. Ford Motor Co.*, 280 F.3d 532, 536 (5th Cir. 2002) ("If the laws of the states do not conflict, then no choice-of-law analysis is necessary." (quoting *W.R. Grace and Co. v. Continental Cas. Co.*, 896 F.2d 865, 874 (5th Cir. 1990))). The Defendants do not argue that a particular state's law should apply, nor do they identify interpretations of agency law that differ from the general principles discussed here. (*See* ECF Nos. 211; 212).

423 F.3d 460, 472 (5th Cir. 2005) ("It is a fundamental rule of agency law that notice to the agent constitutes notice to the principal." (citing *Elite Towing, Inc. v. LSI Fin. Group*, 985 S.W.2d 635, 642–43 (Tex. App.-Austin 1999, no pet. h.))), *and Peel v. Am. Fid. Assur. Co.*, 680 F.2d 374, 377 (5th Cir. 1982) ("If the MEA was Mrs. Peel's agent when it renegotiated policy coverage, knowledge of the change in coverage was imputed to her as principal . . . ." (citing RESTATEMENT (SECOND) OF AGENCY §§ 9(3), 268(1)(c) (1958))), *and IFS Fin. Corp.*, 417 B.R. at 444 ("An agent's knowledge is imputed to the principal."), *and Askanase v. Fatjo*, 130 F.3d 657, 666 (5th Cir. 1997) ("Courts will impute knowledge to the corporation as long as the officer/director is acting on the corporation's behalf." (citing *FDIC v. Ernst & Young,* 967 F.2d 166, 171 (5th Cir.1992))), *and Am. Guarantee & Liab. Ins. Co. v. U. S. Fire Ins. Co.*, 255 F. Supp. 3d 677, 692 (S.D. Tex. 2017), *aff'd sub nom. Satterfield & Pontikes Constr., Inc. v. U. S. Fire Ins. Co.*, 898 F.3d 574 (5th Cir. 2018) (citing RESTATEMENT (THIRD) OF AGENCY § 5.03 (2006)), *and Shell Glob. Sols. (US) Inc. v. RMS Eng'g, Inc.*, 782 F. Supp. 2d 317, 330 (S.D. Tex. 2011). *See also Am. Sur. Co. of New York v. Pauly*, 170 U.S. 133, 153 (1898) ("It is the rule that the knowledge of the agent is the knowledge of his principal, and notice to the agent of the existence of material facts is notice thereof to the principal, who is taken to know everything about a transaction which his agent in it knows."); *Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir. 1994) ("In general, when an agent is employed to represent a principal with respect to a given matter and acquires knowledge material to that representation, for purposes of assessing the principal's rights and liabilities vis-à-vis a third person the agent's knowledge is imputed to the principal."); *Buchanan v. Reliance Ins. Co. (In re Color Tile Inc.)*, 475 F.3d 508, 513 (3d Cir. 2007) ("Where an agent receives notice, that notice is imputed to the principal."); *Martin Marietta Corp. v. Gould, Inc.*, 70 F.3d 768, 773 n.4 (4th Cir. 1995) ("[T]he knowledge imputed to the principal is considered actual knowledge, not

constructive." (citing *Plitt v. Kellam,* 222 Md. 383, 619 n. 4 (Md. 1960))); *Picard v. Avellino (In re Bernard L. Madoff Inv. Sec. LLC)*, 557 B.R. 89, 117 (Bankr. S.D.N.Y. 2016) ("The general rule is that knowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge although the information is never actually communicated to it." (quoting *Ctr. v. Hampton Affiliates, Inc.*, 488 N.E.2d 828, 829 (N.Y. 1985))); *Fowler v. Rauso (In re Fowler)*, 425 B.R. 157, 197 (Bankr. E.D. Pa. 2010) ("Principles of agency dictate that the knowledge DiGiacomo gained as agent for the Downstream Title Defendants be imputed to his principals."); *Field v. Decoite (In re Maui Indus. Loan & Fin. Co., Inc.)*, No. CIV. 13-00091 JMS, 2013 WL 2897792, at *8 (D. Haw. June 13, 2013) ("[W]hen knowledge is imputed, it is as if the principal itself is aware of such facts.").

> The Third Restatement of Agency affirms this general principal:
>
> For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal, unless the agent (a) acts adversely to the principal as stated in § 5.04, or (b) is subject to a duty to another not to disclose the fact to the principal.

RESTATEMENT (THIRD) OF AGENCY § 5.03 (2006).[8] A principal's agent, acting on the principal's behalf, links the principal to the external world. *Id.*, cmt. b (2006). An agent has a duty to "use reasonable effort to transmit material facts to the principal." *Id.* Even if an agent remains silent, the principal is imputed with the agent's knowledge. *Id.* This imputation incentivizes principals to carefully choose agents and "encourages a principal to develop effective procedures for the transmission of material facts, while discouraging practices that isolate the principal or coagents from facts known to an agent." *Id.* As a result of this imputation, "[i]f an agent has actual

---

[8] The Fifth Circuit has cited to the Third Restatement of Agency as an authoritative statement of agency law. *See, e.g., Angel Bros. Enterprises, Ltd. v. Walsh*, 18 F.4th 827, 830 (5th Cir. 2021) ("That principle of vicarious liability is Agency Law 101." (citing RESTATEMENT (THIRD) OF AGENCY § 2.04)).

knowledge of a fact, the principal is charged with the legal consequences of having actual knowledge of the fact." *Id.*

Imputation may exist through subagents working for the principal. *Color Tile*, 475 F.3d at 513 ("This imputation applies to sub-agents as well; from sub-agent to agent, and then from agent to principal." (citing RESTATEMENT (SECOND) OF AGENCY § 283(a) (1958))); *Eugenia VI Venture Holdings, Ltd. v. MapleWood Holdings LLC (In re AMC Inv'rs, LLC)*, 637 B.R. 43, 59 (Bankr. D. Del. 2022) ("[I]t logically follows that Mr. Hassels-Weiler's knowledge is imputed to Casita, and Casita's knowledge is thereby imputed to Investors."); RESTATEMENT (SECOND) OF AGENCY § 283, cmt. b (1958) ("An agent of an agent is not an agent of the principal unless he is employed in the principal's business; hence, unless so employed, the principal is not affected by his knowledge . . . . When he is so employed, however, his knowledge . . . [is] effective to the same extent as if he were employed directly by the principal."); RESTATEMENT (THIRD) OF AGENCY § 3.15, cmt. d (2006) ("When a subagent works on a principal's account, notifications received by the subagent are effective as notifications to the principal to the same extent as if the principal had appointed the subagent directly. Likewise, notice of facts the subagent knows or has reason to know is imputed to the principal to the same extent as if the principal had appointed the subagent directly.").

By signing a Subscription Agreement, each defendant appointed PPBE Holdings LLC as its "true and lawful attorney-in-fact" to "make, execute, acknowledge, deliver and file" various documents. (ECF No. 181-17 at 5–6). This includes the power to execute the LLC Agreement, and so long as consistent with the LLC Agreement, to "take any . . . action as may be necessary in connection with any aspect of the operations of [PPBEO]." (ECF No. 181-17 at 6). By signing the LLC Agreement, each defendant appointed PPBE Holdings LLC as its "true and lawful agent

and attorney-in-fact." (ECF No. 183-10 at 7, 28).  This appointment empowered PPBE Holdings LLC to (i) act in PPBEO's "name, place and stead"; (ii) make PPBEO's investments; and (iii) "execute any trades ancillary to such investments." (ECF No. 183-10 at 28).  PPBE Holdings LLC was each defendant's agent for purposes of administering the defendant's investment in PPBEO.

The defendants do not contest the Trustee's assertion that Nordlicht was the principal of PPBE Holdings LLC, nor do they contest that Nordlicht acted as the agent of PPBE Holdings LLC in that capacity.  Further, as the managing member of PPBE Management LLC, Nordlicht was effectively in charge of PPBEO's investment management. (ECF No. 208-2 at 15).  Nordlicht was the agent for PPBE Holdings LLC and PPBE Management LLC, and while administering the PPBEO investments in Black Elk, was also the defendants' subagent.  Knowledge obtained while acting within the scope of his subagency can be imputed to the defendants.

### B. Adverse Interest

Despite the general rule of imputation, an agent's knowledge will not be imputed if the agent is totally adverse to the principal.  *Stewart v. Wilmington Tr. SP Servs., Inc.*, 112 A.3d 271, 309 (Del. Ch. 2015), *aff'd*, 126 A.3d 1115 (Del. 2015) ("[I]n a case where the agent's action is totally adverse to the interests of his principal, the law will not impute knowledge of the bad act to the principal, because it seems nonsensical to presume that a thieving agent would tell his principal about the theft."); *Hecksher v. Fairwinds Baptist Church, Inc.*, 115 A.3d 1187, 1204 (Del. 2015) ("[T]he adverse interest doctrine may prevent a court from imputing knowledge of wrongdoing to an employer when the employee has totally abandoned the employer's interests, such as by stealing from it or defrauding it."); RESTATEMENT (THIRD) OF AGENCY § 5.04 (2006) ("For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is not imputed to the principal if the agent acts adversely to the principal in a

transaction or matter, intending to act solely for the agent's own purposes or those of another person."). The adverse interest exception is narrow. *Stewart*, 112 A.3d at 309 ("[T]he adverse interest exception is applied narrowly, lest it be expanded to the point of covering more terrain than the rule itself."); *Ctr. V. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784–85 (1985) ("To come within the exception, the agent must have totally abandoned his principal's interests and be acting entirely for his own or another's purposes. It cannot be invoked merely because he has a conflict of interest or because he is not acting primarily for his principal."); *Maui Indus.*, 2013 WL 2897792, at *8 ("Nor were Kimura's interests adverse to DeCoite. For such exception to apply, 'the agent must have totally abandoned the principal's interest and be acting for his own purposes or those of another. In other words, the interests of the agent must be completely adverse to those of his principal.'" (quoting *Great Divide Ins. Co. v. AOAO Maluna Kai Ests.*, No. CIV 05-00608 JMS/LEK, 2006 WL 2830885, at *7 (D. Haw. Sept. 28, 2006))); *In re Wyly*, 552 B.R. 338, 419 (Bankr. N.D. Tex. 2016) ("While an agent's knowledge is *not* imputed to the principal when the agent is acting in a manner that is actively adverse to that of his principal, that adverse interest exception to the general rule is not applicable here, as French's actions were not adverse to the Wylys but were to benefit them.").

Despite the defendants' contention that the adverse interest exception applies, Nordlicht's intentions were not adverse to them. *See Stewart*, 112 A.3d at 309. Nordlicht was trying to obtain returns for the defendants on their PPBEO investments. He worked to transfer funds from the Renaissance Sale to give a return to the PPBEO investors. (ECF No. 181 at 54–56). Nordlicht was not attempting to defraud or steal from the PPBEO investors; the consequence of the fraud was to pay money to the defendants. Nothing that he did was intended to be adverse to their interests. Certainly, the creation of the obligation to return the fraudulently obtained funds is not

an adverse interest; it merely places the defendants in the position of having never benefitted from the fraud in the first instance. *See Maui Indus.*, 2013 WL 2897792, at *8 ("There is no evidence that Kimura completely abandoned DeCoite's interests; indeed, MFC continued to make transfers to DeCoite over many years. Thus, Kimura's knowledge is imputed to DeCoite, which prevents DeCoite from showing that he took the transfers in good faith.").

    **C.    Scope of Agency**

Certain defendants argue that Nordlicht did not act within the scope of his authority as an agent. (ECF No. 212 at 15). The defendants cite to *Ross v. Marshall* for the proposition that "under Texas law, an agent's 'serious criminal activity' is almost never taken within the scope of authority granted by the principal." 426 F.3d 745, 764 (5th Cir. 2005). *Ross* cites to *Williams v. United States* for the proposition that:

> [A]n employee's willful and malicious actions made in the scope of his employment, or any acts which are so connected with and immediately grow out of another act of the employee imputable to the employer, are imputed to the employer unless the employee's actions involve serious criminal activity. Under the exception, an employer is not liable for the employee's intentional or malicious actions that are unforeseeable considering the employee's duties. Thus, even criminal acts can be in the course and scope and impute liability if the acts are foreseeable considering the employee's duties.

71 F.3d 502, 506 (5th Cir. 1995) (citations omitted). If the agent's crimes are foreseeable given the agent's duties, it is still possible for those crimes to be within the scope of the agency relationship. Clearly, Nordlicht's knowledge of Black Elk's finances and the fraudulent transfers were within the scope of his subagency to invest PPBEO funds on the defendants' behalf.

Moreover, the fact that a principal might not be liable for a criminal act by the agent is not the equivalent of the imputation of knowledge for the purposes of an asserted affirmative defense. There might be inequity from the imposition of liability on a principal whose agent committed a

crime. There is nothing inequitable in stopping the principal from benefitting from a crime by their agent of which they had only imputed knowledge.

### D. Application of Imputed Knowledge to Good Faith

The *Picard* and *Templeton* tests ask the same fundamental questions: (i) what knowledge did the transferee have; (ii) would that knowledge be sufficient to put a reasonable person on inquiry notice; and (iii) did the transferee conduct an investigation? *See Templeton*, 785 F.3d at 164; *Picard*, 12 F.4th at 191–92. As a legal fiction, the defendants are imputed with Nordlicht's knowledge. This imputed knowledge would put a reasonable person on inquiry notice. The defendants did not conduct an inquiry. Thus, they are not entitled to a good faith defense under TUFTA Section 24.009(a) or §§ 548 or 550. *See IFS Fin. Corp.*, 417 B.R. at 442; *Maui*, 2013 WL 2897792, at *8 ("The court rejects DeCoite's suggestion that imputed knowledge is a concept wholly distinct from either actual knowledge or inquiry notice—when knowledge is imputed, it is as if the principal itself is aware of such facts. . . . As a result, imputing Kimura's knowledge to DeCoite prevents him from taking benefit of the good-faith defense." (citing *IFS Fin. Corp.*, 417 B.R. at 444)); *Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.)*, 275 B.R. 641, 658 (Bankr. M.D. Fla. 2002) ("Courts will determine whether the good faith defense is established by looking at the actions and knowledge, both actual knowledge and imputed knowledge, of the recipient.").

This good faith case is somewhat unusual with the legal fiction of imputation of knowledge to an individual principal. The defendants argue that they did not have actual notice of the fraud, and as individuals, their agent's knowledge cannot be imputed to them for a good faith determination. (ECF Nos. 211 at 9, 13–14; 212 at 17). It may be tempting to think that a reasonable person with the defendants' actual knowledge would not be on inquiry notice; if, in

reality, they have no knowledge of the fraudulent transfer, how would a reasonable person in their position know to conduct an inquiry?

It is important to note that the defendants' failure to monitor Nordlicht does not determine whether they acted in good faith. Nordlicht had actual knowledge of fraudulent criminal conduct. That knowledge is imputed to the defendants, regardless of whether they actually knew of the wrongdoing. Typically, the duty of inquiry commences with an awareness of "red flags" that require a reasonable person to investigate whether there was wrongdoing. Here, the inquiry duty starts with an imputed foundational understanding that criminal conduct occurred. Any inquiry would have required the defendants to gather enough information to prove or disprove the accuracy of Nordlicht's knowledge. Of course, the defendants acknowledge that they made no inquiry because their knowledge is only imputed by a legal fiction. Nonetheless, the defendants *are* imputed with that knowledge. The absence of an investigation leaves their imputed knowledge intact. With their imputed knowledge that the funds they received came from fraudulent criminal conduct, the defendants cannot sustain a good faith defense.

The Court declines to upend basic tenants of agency law. Indeed, the failure to impute Nordlicht's knowledge would be problematic: if transferee-principals can retain a fraudulent transfer under a good faith "ignorance" defense, innocent creditors—the parties ultimately entitled to the fraudulently-transferred property—are left holding the bag because the principal-transferee did *not* monitor its agent. This would, unfortunately, create an incentive to hire unscrupulous agents and then to ignore their conduct. This flies in the face of widely accepted agency law and basic fairness. RESTATEMENT (THIRD) OF AGENCY § 5.03, cmt. b (2006) ("Imputation creates incentives for a principal to choose agents carefully and to use care in delegating functions to them. Additionally, imputation encourages a principal to develop effective procedures for the

transmission of material facts, while discouraging practices that isolate the principal or coagents from facts known to an agent.").

The legal fiction of imputed knowledge is important and equitable; it avoids a perverse incentive. In a statutory decision balancing the equities, Congress did not permit defendants to benefit from the wrongdoing of their agent.

## II.   AFFIRMATIVE DEFENSES

The Rechnitz defendants argue that the Trustee improperly failed to address their affirmative defenses, including that (i) the Trustee "failed to demonstrate that the Rechnitzes received property of the Debtor"; and (ii) the applicable statutes of limitations are a legal bar to the Trustee's claims . . . ." (ECF No. 212 at 11–12). The Rechnitzes claim that the Trustee fails his initial burden when he fails to address their affirmative defenses. (ECF No. 212 at 12).

The Rechnitzes mischaracterize the scope of this portion of the litigation. This opinion solely concerns the imputation of Nordlicht's knowledge. If there was a genuine dispute of material fact, it would be determined at trial. But with no disputed material facts, the Court determines that Nordlicht's knowledge is imputed as a matter of law. Due to the narrow scope of his motion, the Trustee need not examine the Rechnitzes' affirmative defenses unrelated to imputation. If, at the appropriate time, those affirmative defenses are sufficient to end this litigation, they will do so. But those affirmative defenses are irrelevant for imputation.

## CONCLUSION

A separate order will be entered.
SIGNED 01/27/2023

Marvin Isgur
United States Bankruptcy Judge